UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| RAIN CII CARBON, LLC | * | CIVIL ACTION NO. 12-2014 |
|     Plaintiff | * | |
| | * | SECTION: H |
| | * | JUDGE JANE TRICHE MILAZZO |
| VERSUS | * | |
| | * | |
| | * | MAGISTRATE: 1 |
| STEPHEN KURCZY, ET AL | * | MAG. SALLY SHUSHAN |
|     Defendants | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER AND REASONS

The matter before the Court is a Motion for Preliminary Injunction filed by Plaintiff Rain CII Carbon, LLC. On July 31, 2012, the Civil District Court of Orleans Parish entered a Temporary Restraining Order. The case was removed to this Court on August 6, 2012 and a hearing on the Motion for Preliminary Injunction was held on August 17, 2012. For the following reasons, the Motion for Preliminary Injunction is DENIED.

-1-

**BACKGROUND**

Rain CII Carbon, LLC ("Rain") is a Louisiana limited liability company that produces calcined coke at their four production facilities located in Louisiana. Rain is one of the largest coke calciners in the world. As a privately held company, Rain's financial information is not made available to the general public. The Defendants are MergerMarket (U.S.) Limited ("MergerMarket"), Financial Times Group, Debtwire North America ("Debtwire") and Stephen Kurczy ("Kurczy"). MergerMarket, an affiliate of the Financial Times Group, has several subscriber only publications, including Debtwire. Kurczy is Debtwire's primary reporter covering companies in the North American chemical market.

On July 30, 2012, Rain published a compilation of its second quarter confidential financial information ("The Data Sheet") on a secure, protected website. In addition to Rain's Chief Executive Officer, Chief Financial Officer and Maria Reyes, Rain's bondholders and potential investor bondholders are allowed access to the secured website after agreeing to a non-disclosure agreement. The Data Sheet posted on July 30th consists of Rain's detailed financial information, including its gross margins, management's discussion and analysis of their results of operations, its current financial information versus prior periods, and its current financial condition.

On the morning of July 31, 2012, Kurczy sent an email to Rain's Recruiting and Public Relations Manager, Elizabeth Clouatre, asking for a comment for a news report concerning Rain's 2012 second-quarter earnings. Ms. Clouatre responded to Kurczy via email stating that the: (a)

company is privately held; (b) the release of the information is not authorized; and (c) that he will be contacted by attorneys upon release of any financial information. Later, Debtwire released a news report ("the Article") regarding Rain's second-quarter earnings to Debtwire's subscribers via an email alert.

On that same afternoon, July 31, 2012, Rain filed suit in the Civil District Court of Orleans Parish, State of Louisiana, requesting a Temporary Restraining Order ("TRO"), Preliminary Injunction and Permanent Injunction and Damages under the Louisiana Uniform Trade Secrets Act codified at La. Rev. Stat. Ann. § 51:1431-1439. The Orleans Parish Civil District Court Judge granted the TRO ordering Debtwire and the Financial Times Group to remove the Article and prohibiting the continued publication of the Article. The Defendants then filed a Motion to Dissolve the TRO which was denied. Defendants subsequently filed an emergency writ to the Louisiana Fourth Circuit Court of Appeal challenging the TRO, the order granting the extenstion of the TRO and the order denying the Motion to Dissolve the TRO. The Fourth Circuit denied all writ applications.

On August 6, 2012, Defendants removed the suit, based on diversity, to this Court. (Doc. 1.) Immediately following Defendants' removal, Plaintiff filed a First Amended Complaint (Doc. 3) and a Motion to Remand (Doc. 5). On August 8, 2012, the Court held an expedited hearing on Plaintiff's Motion to Remand. (Doc. 20.) On August 10, 2012, the Court denied Plaintiff's Motion to Remand and set a preliminary injunction hearing for August 17, 2012. (Doc. 23.) The parties stipulated that the TRO would remain in place until the Court's ruling on the Motion for Preliminary

Injunction.

Prior to the preliminary injunction hearing, both parties filed multiple pleadings and affidavits in support of their respective positions. (*See* Docs. 40, 42, 44, 46, 47.) At the hearing on August 17, 2012 the Court heard oral argument from the parties. Rain offered in camera the testimony of Colleen Ulrich, the Chief Financial Officer of Rain. Rain also introduced as exhibits Rain's bond offerings, the Data Sheet and the Article. [1]

After the hearing, Defendants produced an affidavit from Stephen Kurczy swearing that he had neither accessed the secured website nor had he seen the Data Sheet. Plaintiffs produced an follow-up affidavit from Colleen Ulrich that established that the collective information in the Data Sheet could be used to calculate the gross margins.

**LAW AND ANALYSIS**

Plaintiff alleges that the actions of the Defendants constitute a violation of Louisiana's Uniform Trade Secrets Act ("LUTSA"). Specifically, Plaintiff argues that the financial information provided on their website is a "trade secret" that is protected under LUTSA, that their "trade secret" was "misappropriated," and that the "actual or threatened misappropriation" must be enjoined. (Doc. 40, p. 5.)

An injunction under LUTSA may be granted when there is either actual or threatened

---

[1] The Data Sheet and The Article were introduced in camera.

misappropriation of a trade secret. La. Rev. Stat. Ann. § 51:1432 (West 2012). A trade secret is:

> [i]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

La. Rev. Stat. Ann. § 51:1431. LUTSA states that a "misappropriation" means:

> (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (b) disclosure or use of a trade secret of another who:
> (i) used improper means to acquire knowledge of the trade secret; or
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> (aa) derived from or through a person who had utilized improper means to acquire it;
> (bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (cc) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.*

Rain presented evidence that the gross margins were a trade secret.[2] Courts have found that gross margins constitute trade secrets. *See Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112,

---

[2] Notably, Ulrich testified that the Article did not contain Rain's gross margins. The gross margins, however, could be ascertained by analysis of the Data Sheet.

1117 (Fed. Cir. 1996) (affirming a trial court's finding that economic information, including gross margins, sales data, market analysis information, hinge profile sales data, customer lists and capitalization requirements, were trade secrets). Additionally, the Data Sheet can be considered a trade secret as a compilation under Uniform Trade Secrets Law.[3] *See AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011) (compilations of non-secret and secret information are considered valuable if the combination affords a competitive advantage and is not readily ascertainable); *see also Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003) ("[E]ven if all of the information is publicly available, a unique combination of that information which adds value to the information also may qualify as a trade secret."). Further, Rain provided evidence that the financial information derived economic value by not being generally known to the public and that they took reasonable efforts to keep the Data Sheet secret. Thus, this Court finds that Rain's Data Sheet could reasonably be considered a "trade secret" under the Louisiana Uniform Trade Secrets Act.

Ultimately, however, this Court finds that the danger of suppression of the press under the First Amendment outweighs the danger of violation of the Louisiana Uniform Trade Secrets Act. On the one hand, trade secret laws are designed to maintain the standards of commercial ethics in protecting the commercial value and competitive advantages inherent in trade secrets. *See* La.

---

[3] Louisiana has adopted the Uniform Trade Secrets law. *See* 14 Uniform Laws Annotated, Master Ed., Civil Procedural & Remedial Laws at 529 (2005).

Rev. Stat. Ann. § 51:1431 comment(a); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974).  On the other, "[t]he First Amendment protects freedom of speech and freedom of the press by providing, 'Congress shall make no law . . . abridging the freedom of speech, or of the press . . .'." *Ford Motor Co. v. Lane*, 67 F. Supp. 2d 745, 751 (E.D. Mich. 1999).  Thus, despite the finding that Rain's Data Sheet is arguably a trade secret, the Court concludes that authorizing an injunction in this context violates the First Amendment.  Accordingly, the Court finds that the injunction provision of the Louisiana Uniform Trade Secrets Act should not apply in this case.

The First Amendment, applicable to the States via the Fourteenth Amendment, protects freedom of speech and freedom of the press.  *See Near v. Minn.*, 283 U.S. 697, 707 (1931).  The primary purpose of the guarantee of freedom of the press is to prevent prior restraints on publication.  *Id.* at 713.  "Temporary restraining orders and permanent injunctions - i.e., court orders that actually forbid speech activities - are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993).  "It has been clearly established that any prior restraint on expression comes to this Court with a heavy presumption against its constitutional validity." *CBS, Inc. v. Davis*, 519 U.S. 1315, 1317 (1994) (citing *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)) (internal citations omitted).  "Although the prohibition against prior restraints is by no means absolute, the gagging of publication has been considered acceptable only in exceptional cases."  *Id.* (citing *Near*, 283 U.S. at 716).

Rain has failed at meeting its burden of proving that this case is one of those exceptional

cases. The Supreme Court in *Near* explained that prior restraints may be issued in rare cases, such as when it is necessary to prevent the publication of troop movements during wartime, the publication of obscene material or to prevent the overthrow of the government. *Id.* Even in times of war, however, the issuance of prior restraints has been limited. *See New York Times Co. v. U.S.*, 403 U.S. 713, 726-27 (1971) (Brennan, J. concurring) (an alleged threat of "grave and irreparable injury" to national security is too speculative to justify prior restraint on speech). Ultimately, "[b]efore a prior restraint may be imposed by a judge . . . there must be an imminent, not merely likely, threat" and "[t]he danger must not be remote or even probable; it must be immediately imperil." *U.S. v. Columbia Broad. Sys., Inc.*, 497 F.2d 102, 104 (5th Cir. 1974) (quoting *Craig v. Harney*, 331 U.S. 367, 376 (1947)).

Rain argues that it will suffer irreparable harm for which a future award of future damages would be inadequate. There is no doubt to this Court that Rain could face economic harm; however, economic harm is insufficient in itself to justify a prior restraint, especially when based on speculative predictions. *See, e.g., CBS*, 519 U.S. at 1318; *Neb. Press Assn. v. Stuart*, 427 U.S. 539, 563 (1976); *New York Times Co. v. United States*, 403 U.S. 713 (1971).

Moreover, while the Data Sheet may be a trade secret, numerous courts have held that enjoining public disclosure of a trade secret is a prior restraint on speech. *See, e.g., CBS*, 519 U.S. at 1315 (staying a lower court order granting a preliminary injunction because the alleged misdeeds of the information gatherer and the threat of economic harm are insufficient to justify a prior

restraint); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996) (a private litigant's interest in protecting their commercial self interest does not justify imposing a prior restraint even though the information sought to be published was allegedly obtained improperly and derived from documents considered trade secrets and confidential); *Ford Motor Co. v. Lane*, 67 F. Supp. 2d 745, 750 (E.D. Mich. 1999) (despite a finding that the defendant likely violated the Uniform Trade Secrets Act, the issuance of an injunction would violate the prior restraint doctrine and First Amendment); *Religious Tech. Ctr. v. Lerma*, 897 F. Supp. 260, 267 (E.D. Va. 1995) (denying a preliminary injunction in favor of the Washington Post even though documents may have been trade secrets and infringed upon copyright laws); *State ex. rel. Sports Mgmt. News, Inc. v. Nachtigal*, 921 P.2d 1304, 1305 (Or. 1996) (overturning a preliminary injunction after finding that the publication of a trade secret by a newsletter is protected speech).

One court, however, has not followed this trend. The California Supreme Court in *DVD Copy Control Ass'n v. Bunner,* 31 Cal. 4th 864 (Cal. 2003) ("Bunner III"), found that an injunction was proper because Bunner misappropriated the plaintiff's trade secrets in violation of California's trade secret laws. Rain argues to the Court that Bunner III is applicable and should provide guidance to the Court.

In Bunner III the DVD Copy Control Association, Inc. ("DVD CCA") was charged with granting and administering licenses of the confidential and proprietary technology to encrypt copyrighted content on DVD's so that the content could not be copied. *DVD Copy Control Ass'n.*, 31 Cal. 4th at

871. Despite the efforts to safeguard this technology against unauthorized copying or transmission John Johansen acquired it. *Id.* Johansen utilized the information and wrote a program called DeCSS that decrypted movies stored on DVD's thereby enabling its users to copy and distribute the movies. *Id.* DeCSS subsequently appeared on web sites, including one maintained by Andrew Bunner. *Id.* at 872. Upon discovery of the web sites, DVD CCA filed an action against Bunner and similar defendants alleging trade secret misappropriation. *Id.* DVD CCA did not seek damages, but instead only sought an order enjoining or restraining the web sites from disclosing or distributing the information. *Id.*

The trial court granted the preliminary injunction finding that (1) Bunner knew or should have known that Johansen acquired the trade secret by improper means; (2) the trade secret status had not been destroyed because it had been posted on the internet; and (3) DVD CCA would suffer irreparable harm without an injunction. *Id.* at 873. ("Bunner I"). The Court of Appeal reversed, finding that even if the injunction was justified under California's trade secret law, the injunction violated the First Amendment. *Id.* at 874. ("Bunner II"). The California Supreme Court then reversed the Court of Appeal, finding that the injunction was proper. *Id.* at 889. The California Supreme Court noted that their was decision was "quite limited" and held that "[t]he preliminary injunction does not violate the free speech clauses of the United States and California Constitutions, *assuming* the trial court properly issued the injunction under California's trade secret law." *Id.* at 889 (emphasis in original).

Bunner III is distinguishable in many ways. Most significant to the case before this Court is that Bunner III was a non-media defendant. In this case the Defendants are media defendants. Debtwire is a subscriber only publication of MergerMarket. (Doc. 44-1, Ex. A.) MergerMarket's news publications, including Debtwire, report on financial news and are accredited members of the United States Senate Press Gallery. (*Id.*) The case before the Court involves a journalistic disclosure to the public, not a private theft for personal gain as in Bunner III. The First Amendment is a constitutional safeguard that "[w]as fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people" and this case does not warrant impeding that safeguard. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

Additionally, Bunner III suggests that trade secrets are always matters of private concern. *DVD Copy Control Ass'n*., 31 Cal.4th at 883. Conversely, Justice Breyer's concurrence in *Bartnicki v. Vopper* recognized that trade secret law permits disclosure relevant to matters of substantial public concern. *Bartnicki v. Vopper*, 532 U.S. 514, 539 (2001) (Breyer, J. concurring) (citing Restatement (Third) of Unfair Competition § 40, Comment c (1995)). This Court finds that the Article is a matter of public concern. Rain produces approximately ten percent of the world's supply of anode-grade calcined petroleum coke, a raw material used in the aluminum smelting process. Rain states on their website that they are a key player in the production of the daily staples of our society. (See Doc. 44-1, Ex. A.) Rain is also rated by public ratings agencies, like

Standard and Poor ("S&P") who publicly releases financial data on Rain's performance in periodic ratings updates, or upgrades or downgrades of its debt. (*Id.*) Moreover, Rain has previously released its financial information to news organizations for public consumption. Rain's Chief Executive Officer, Gerry Sweeney, testified before the House Sub Committee on Energy and Power on June 19, 2012 regarding the effect the "EPA Greenhouse Regulation" would have on his business. (*Id.*) Under these circumstances, this Court does not find that the financial information of Rain is a purely private concern.

Lastly, Bunner knew or had reason to know that the trade secrets were acquired by improper means. *DVD Copy Control Ass'n.*, 31 Cal. 4th at 882. In this case, however, Kurczy obtained the information for the Article from two independent confidential sources.[4] (Doc. 29-2, p. 36.) He affirmed that he did not obtain the information for the Article from Rain's password-protected website. (*Id.* at 38.) Further, he did not have any knowledge that his confidential sources had supposedly breached any commitment of confidentiality. (*Id.*) On the other hand, Rain provided evidence that Kurczy was put on notice that their financial information was confidential and should not be released. This notice, however, is insufficient to justify a prior restraint on speech. *See Ford Motor Co.*, 67 F. Supp. 2d at 753 ("In the absence of a confidentiality agreement or fiduciary duty between the parties" one's commercial interest in its trade secrets and the defendant's alleged improper conduct in obtaining the trade secrets are not grounds for issuing

---

[4]Notably, Kurczy declared that he does not have the Data Sheet. (Doc. 49-1.)

a prior restraint).

In addition to Bunner III, Rain requests the Court to rely on *Madsen v. Women's Health Ctr.*, Inc., 512 U.S. 753 (1994). In this case, the United States Supreme Court declined to apply the prior restraint doctrine to injunctions which are issued not because of the content of the expression but because of the prior unlawful conduct. *Id.* at 763, n.2. The Court finds *Madsen* distinguishable from the case at hand. The injunction at issue in *Madsen* was not a blanket restriction on speech as the injunction in this case would be. Instead it was merely a time, place and manner restriction on speech. *Id.* at 764. The *Madsen* petitioners could express the entirety of their message to their intended audience and were not prevented from expressing their message in any one of several ways. *Id.* at 763, n.2. Instead, the petitioners were simply prohibited from expressing it within a small "buffer" zone. *Id.* In contrast, the injunction the Plaintiff seeks in this case would prevent Defendants not only from expressing their message entirely but also from directing their message to their intended audience.

Ultimately, the First Amendment requires that the press be free to publish truthful business information. In this limited situation, Rain's interest in its Data Sheet is not a grounds for issuing a prior restraint. Accordingly, Rain's request for preliminary injunction of the Defendants publishing the Article must be denied.

## CONCLUSION

For the foregoing reasons, the Motion for Preliminary Injunction filed by Plaintiff, Rain CII Carbon is DENIED. The Temporary Restraining Order issued on July 31, 2012 is DISSOLVED.

New Orleans, Louisiana this 20th day of August, 2012.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT COURT JUDGE**